First National Benefit Society, a Corporation v. Commissioner.
First Nat'l Ben. Soc'y v. Commissioner
Docket No. 14661.
United States Tax Court
1949 Tax Ct. Memo LEXIS 78; 8 T.C.M. (CCH) 841; T.C.M. (RIA) 49227; September 13, 1949
*78 1. Petitioner failed to establish that it was a life insurance company as contemplated by section 201, I.R.C., and entitled to be taxed as such, its so-called "reserve funds" not being held exclusively for the fulfillment of its life insurance and other like contracts and being subject to invasion for other purposes. 2. Petitioner as a mutual insurance company, other than life, is not entitled to a deduction for a deposit made with the State Treasurer of Arizona since the reserve funds were not such as those specified in section 201(c) (1) (A). 3. During the taxable year, petitioner was not an assessment company and as such not entitled to deductions claimed under section 207(c) (1) (A). 4. Petitioner, on a cash basis, is not entitled to a deduction for a portion of its general manager's compensation not paid in 1939 but claimed as an accrued expense liability. Robert R. Weaver, Esq., for the petitioner. L. C. Aarons, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined a deficiency of $1,135.83 in the petitioner's income tax liability for the year 1939. The primary issue is whether the petitioner, during the year 1939, was a life *79 insurance company within the provisions of section 201 of the Internal Revenue Code, or was a mutual insurance company, other than life, within the meaning of section 207 thereof. If the petitioner is held to be a mutual insurance company other than life, as defined by section 207, the subordinate issues are: 1. Was the petitioner entitled to a deduction of $4,518.71, deposited with the Arizona State Treasurer during the taxable year, under the provisions of section 207 (c) (1) (A)? 2. Was the petitioner, on the cash basis, entitled to deduct $3,675.41 representing the unpaid portion of the salary of its president due during the taxable year? 3. Was the petitioner entitled to deduct further amounts under the provisions of section 207 (c) (3)? Findings of Fact Certain facts were stipulated. The portions thereof material to the issues are as follows: The petitioner is a corporation organized and existing under and by virtue of the laws of the State of Arizona. The petitioner filed its Federal income tax return for the calendar year 1939 with the collector of internal revenue for the district of Arizona. On its return the petitioner reported no tax liability. During the period involved, *80 the petitioner was engaged in business under the "Benefit Corporation Law of 1937" of the State of Arizona, being Chapter 36 of the Arizona Session Laws of 1937, and incorporated in the Arizona Code of 1939 as sections 53-601 to 53-622, inclusive. Its purpose was - "That the objects and purposes for which said Corporation is formed are: To engage in, conduct and carry on the business and customary activities of a mutual benefit association within the meaning and provisions of Sections 607-608-609-610 of Chapter 14 of Article 3 of the 1928 Revised Statutes of the State of Arizona as the same now exists; * * *" In the Articles of Incorporation, the petitioner is given authority to issue certificates of membership in assessment form and guaranteed cost certificates of various types. Its contractual liabilities "upon any one member" was specifically limited in both cases. Its funds were denominated (1) Benefit Fund, (2) General Fund, and (3) Reserve Fund and/or Trust Fund. The funds were described as follows: "Benefit Fund and/or Reserve Fund and/or Trust Fund: The Benefit Fund and/or Reserve Fund and/or Trust Fund of the Corporation, consisting of those moneys received shall be used for *81 the purpose of payment of claims originating under and in connection with claims pertaining to all certificate forms, and in addition thereto such funds shall be charged a nominal amount for each claim in connection therewith as expense money as so allocated by all contracts of membership. Such amount to be determined from time to time as the Board of Directors may deem advisable. "General Fund: The General Fund consisting of the membership fee, semiannual dues, and other portions of money so allocated to said fund from any source whatsoever, and shall be used for general administration purposes of the business in its entirety except payments of death claims, and the General Fund of the Corporation shall in no way be subject for use of payment of any death claims unless at the discretion of the Board of Directors. "Reserve Fund and/or Trust Fund: The Reserve Fund shall be distributed to the Benefit Fund and consist of those moneys allocated to such fund as so specified in the Guaranteed Cost certificates of membership, and such fund shall be used for payment of death claims as so specified membership certificates; and in addition thereto such funds shall be charged a nominal amount *82 for each claim in connection therewith, as expense money as so allowed by all contract of membership. Such amount to be determined from time to time as the Board of Directors may deem advisable." The scope of the petitioner's fund was set forth as follows: "Section I. The funds of the Society which consist of the following: The Benefit Fund and/or Reserve Fund and/or Trust Fund, and such other funds as the Board of Directors may hereafter from time to time determine and establish. A separate accounting for such funds shall be kept in the books of the Society. "Section II. Benefit Fund, and/or Reserve Fund, and/or Trust Fund: The Benefit Fund, and/or Reserve Fund, and/or Trust Fund, which consist of all moneys paid to or coming into the possession of the Society, during the notice period allowed in the certificate and notice for the payment of death assessments made from time to time by order of or direction of the Board of Directors for the purpose of paying death claims of members, taxes and other necessary expenses incurred in the administration and defense of said fund. "Section III. General Fund: The General Fund which shall consist of such amounts so specified as dues and other *83 renewal moneys collected after the notice period allowed in the certificate and notice for the payment of the death assessments shall be used to defray expenses incidental to the operation of the Society, including salaries, rentals, printing, postage, etc. "Section IV. Reserve Fund and/or Trust Fund: The Reserve Fund and/or Trust Fund, shall consist of those moneys allocated to such fund as so specified in certificate of membership so issued by the Corporation. Such moneys shall be used for payment of death claims in accordance with the terms of the membership certificates and for taxes and other necessary expenses incurred in the administration and defense of said fund." By amendments to its By-Laws the petitioner was authorized to issue various certificates called Guaranteed Reserve, Juvenile, Family Burial, Family Group, Accident and Health, Joint policy, "Penny a day life", Death Benefit, etc., and various modifications of the certificates already authorized. The petitioner issued Forms H, XXX, XXX-GG, XXX-J, XXX-FG, and A-H-1 typical of membership certificates and insurance policies issued by it during 1939. All of these policies were designated "Guaranteed Reserve Certificates". *84 In all of them appears the provision, "The member shall not be liable for any debts of the Corporation or for any other obligations save and except the premium deposits required hereon and then only so long as the Certificate remains in force and effect." Form H covered death from any cause; Form XXX covered natural and accidental death and loss of limb; Form XXX-GG covered natural death of member and accidental death of member and beneficiary; Form XXX-J covered natural and accidental death of member and co-member; Form XXX-FG covered natural and accidental death of the member and dependants, while From A-H-1 covered accidental loss of life and limb, disability benefits, etc. Each policy provided that premium deposits after one year from the date of the policy should consist of the certificate fee and General Fund Dues and after the payment of the General Fund Dues the remainder of such deposits should "be placed in a Trust Fund for distribution to the Mortuary Fund as required"; except Form A-H-1 which required the remainder to be distributed to the "claim fund." All policies contained the clause: "Reserve: The By-Laws of the Corporation require the deposit in an amount not less *85 than fifty per cent (50) of each premium deposit for the purpose of payment of claims and expenses incidental thereto." The type and number of policies issued by the petitioner and in force, as of May 31, 1939, were as follows: Number
Type
of Policies
Assessment Forms
34
Individual
7,253
Family group
2,369
Joint
685
Juvenile
219
Health and Accident
249
Penny a Day
181
Total
10,990
The petitioner's income during the calendar year 1939 was entirely from premium payments and none of its income was from interest, dividends or rents. On June 30, 1937, the petitioner's board of directors, consisting of M. C. Reese, M. S. Reese and C. W. Reese, authorized the petitioner, to employ M. C. Reese as its general manager for a term of 20 years and pay him for his services a sum equal to 10 per cent of the petitioner's gross income. During the year 1939 Reese earned $18,075.11 pursuant to the employment contract but was paid only $12,000, leaving a sum of $6,075.11 on its books as due to him. The record discloses the following additional facts: The petitioner maintained only one bank account in which all its receipts were placed. No attempt was made by the petitioner to separate the various expense and reserve funds. *86 The actual segregation was shown only on its books. Its books were maintained on a cash basis and its income tax return was filed on that basis. Prior to and during the taxable year the petitioner relied on its annual premium receipts to pay its current expenditures, including claims. Prior to March, 1947, when the petitioner became a legal reserve company, no valuation was made of individual policies as a basis of determining the proper legal reserve. As the petitioner now operates, the policy reserves must build themselves up with interest increases. In all its years of operation the petitioner never levied any assessments against its members or policy holders. In showing the financial status of the petitioner's "Mortuary Fund" during 1939, losses or claims were accrued at the beginning and end of the year. The petitioner's books and records in other respects conform to the cash basis of accounting. Upon examining the petitioner's income tax return for the year 1939, showing no tax liability, the Commissioner held that its contention that it should be classified as a life insurance company under the provisions of section 201, I.R.C., was denied and that it was a mutual insurance *87 company under section 207 thereof. He then determined an adjusted net income of $6,883.83 as disclosed by the petitioner's books. The adjustments were made with the following explanations: Items deducted in computing net income shown in your audit report not deductible for income tax purposes: (a) Compensation under M. C.
Reese Contract
$3,675.41
(b) Amount deposited with
State Treasurer
4,518.71
(c) Accrued losses (Claims)
December 31, 1939
47.34
8,241.46
(d) Less: Accrued losses
(Claims) December 31,
1938 overstated in your
audit report
3,323.00
Difference as shown above
$4,918.46
(a) Compensation under M. C.
Reese Contract
$3,675.41 The amount claimed as a deduction in your audit report as compensation due M. C. Reese under an alleged employment contract amounts to $18,075.41. The amount actually paid Mr. Reese during the year under said alleged contract amounted to $14,400.00; the difference, $3,675.41, is disallowed for the reason that your books and records are on the cash basis of accounting. (b) Amount deposited with State Treasurer
$4,518.71
The amount, $4,518.71, deposited with the Arizona State Treasurer during the taxable year does not constitute additions required by law to be made within *88 the taxable year to reserve funds within the meaning of section 207 of the Internal Revenue Code and therefore is not a proper deduction in computing your taxable net income under that section of the Act. (c) Accrued losses (claims) at De-
cember 31, 1939
$47.34
The amount of accrued losses (claims) at December 31, 1939 shown in your audit report at $4,299.99 has been reduced to $4,252.65. The balance, $47.34, has not been substantiated as proven claims. (d) Accrued losses (claims) at
December 31, 1938
$3,323.00
The amount of accrued losses (claims) at the beginning of the taxable year 1939, shown in your audit report at $5,155.49, has been reduced to $1,832.49, the amount reflected in the computation of your taxable net income for the preceding taxable year 1938 as accrued losses (claims) at the close of that year. Opinion VAN FOSSAN, Judge: The basic question at issue is whether or not the petitioner is a life insurance company as contemplated by the provisions of section 201, I.R.C., and, under the facts of record, free from tax liability, or was a mutual insurance company other than life and entitled to certain deductions as such, as provided in section 207. The respondent's contention *89 is that the petitioner is not a true life insurance company because it did not have "reserve funds" and that the "reserves", if any, were not "held for the fulfillment of its insurance contracts." He invokes section 19.203 (a) (2)-1 of Regulation 103 [1] which contains the definition of the word "reserve", adapted, as the respondent says, from the definition of that word as found in Maryland Casualty Co. v. United States, 251 U.S. 324. [2] *90 It was stipulated that the petitioner's income was derived wholly from premium payments and that none of it came from interest, dividends, or rents. Section 202 (a) (1) defines the gross income of life insurance companies as follows: "SEC. 202. GROSS INCOME OF LIFE INSURANCE COMPANIES. (a) Gross Income Defined. - (1) In General. - In the case of a life insurance company the term "gross income" means the gross amount of income received during the taxable year from interest, dividends, and rents." The petitioner argues, therefore, that since it had no income from interest, dividends and rents it had no tax liability. It assumes and contends that it was a true life insurance company and qualified as such under the statutory definition of that type of organization as set forth in section 201 (a), as follows: "SEC. 201. TAX ON LIFE INSURANCE COMPANIES. (a) Definition - When used in this chapter the term "life insurance company" means an insurance company engaged in the business of issuing life insurance and annuity contracts (including contracts of combined life, health, and accident insurance), the reserve funds of which held for the fulfillment *91 of such contracts comprise more than 50 per centum of its total reserve funds." A brief history of life insurance company taxation as it relates to section 201 is found in Helvering v. Oregon Mutual Life Ins. Co., 311 U.S. 267, as follows: "Legislative history discloses that a deduction similar to that allowed by section 203 (a) (2) first appeared in the Revenue Act of 1921, and has reappeared in every revenue measure since, including that of 1939. Prior to 1921, insurance companies had not been allowed such a deduction, but had been subject to the same tax plan as corporations generally; the 1921 Act, however, wholly exempted insurance companies from the general scheme of corporate taxation and set up special systems applicable to them alone. The new plan, as it related to life insurance companies, had as a major objective the elimination of premium receipts from the field of taxable income. It had long been pointed out to Congress that these receipts, except as to a very minor proportion of each premium, were not true income but were analogous to permanent capital investment. In all the Revenue Acts from 1921 through 1939, the gross income of life insurance companies no longer included *92 premium receipts, but was limited to income 'from interest, dividends, and rents.' And, pursuant to the conceived analogy of reserves to capital investment, net income was to be determined by permitting, among other deductions from gross income, that same deduction here in dispute - a percentage of the 'reserve funds' required by law. "As entirely new and separate tax provisions relating only to life insurance companies were thus enacted, it became necessary specifically to define what constituted a 'life insurance company' within the meaning of the Act. Therefore, it was declared in the 1921 Act and all its successors that 'when used in this title [chapter] the term "life insurance company" means an insurance company engaged in the business of issuing life insurance, and annuity contracts (including contracts of combined life, health, and accident insurance), the reserve funds of which held for the fulfillment of such contracts comprise more than 50 per centum of its total reserve funds.'" In the case at bar the controversy on this point is narrowed down to the factual issue whether or not more than 50 per cent of the petitioner's reserve funds were held for the fulfillment of its *93 life, health, disability and other contracts which came within the purview of the statute. Upon careful study of the record we find no adequate support of the petitioner's theory. In fact, the weight of the evidence is strongly against him. The petitioner maintained only one bank account into which the receipts from all sources were deposited and from which all disbursements were made. No segregation or allocation was made of the receipts, except a nominal one, on the petitioner's books. The petitioner made no attempt to separate its various expense and reserve funds. It relied on its current premium receipts to pay its current expenditures including claims. No evaluation was made of individual policies from which a correct legal reserve might have been established. The petitioner never levied any assessments against its members or policy holders. In fact, with an insignificant exception, (34 out of 10,900) assessment forms were not issued. In all but one of the certificates submitted to us a clause was inserted that the petitioner's by-laws required a deposit not less than 50 per cent (not more) of the premiums for the payment of "claims and expenses incidental the-eto." Even the *94 exhibits submitted by the petitioner purporting to show the flow of funds into the mortuary reserve do not help its position. The petitioner's Articles of Incorporation did not require that any reserve should be held exclusively for the purpose of paying claims arising out of the "certificate" contracts but the so-called reserve funds might be invaded for any purpose. In Commissioner v. National Reserve Ins. Co., 160 Fed. (2d) 956, the taxpayer, an Arizona corporation, was organized pursuant to the provisions of the Arizona "Benefit Corporation Law", the same legislation under which the petitioner was organized. In that case the Court held that although the reserve for the fulfillment of policy claims amounted to more than 50 per cent of the total reserve fund, the corporation was not a life insurance company because the reserve was also held for additional purposes. The Court further held that "Since the Company maintained only one 'reserve' fund, its mortuary fund, and since this fund was subject to invasion for premium refunds, it does not meet the statutory test which specifies a reserve fund held only to fulfill contracts." Thus the decision of the Circuit Court of Appeals sustains *95 the respondent's contention that the reserve must be set aside exclusively for the fulfillment of contracts classified as life insurance commitments. As a side light to the conclusion of the Court in the National Reserve case we note that in the report of the Committee on Ways and Means accompanying H.R. 7378, relating to the Revenue Bill of 1942, 77th Congress, 1st Session, the statement is made: "Section 201 (c) (2) is new and defines the term 'life insurance reserves.' The definition is substantially that contained for many years in the regulations with the addition that the reserves must be based on recognized mortality or morbidity tables, the health and accident reserves must be noncancelable, and unpaid loss reserves on such health and accident contracts are included if computed on a discount basis." We also note that the petitioner was organized and engaged in business by authority of the Benefit Corporation Law of 1937 of Arizona (Chapter 36 Arizona Session Laws of 1937 - Sections 53-601 to 53-622, inclusive, Arizona Code of 1939) and not under Chapter 61, Arizona Code of 1939, which covers the creation, operation and regulation of life insurance companies. This fact is significant *96 in evaluating the petitioner's attempt to secure the benefit of Federal tax exemption. Further in its Articles of Incorporation it states precisely that it was formed to "engage in, conduct and carry on the business and customary activities of a mutual benefit association within the meaning and provisions of Section 607 (et seq.)". Section 53-605 (one of the provisions in the Arizona Code corresponding to Section 607 et seq.) provides that a benefit corporation shall deposit with the state treasurer of Arizona $1,000 before receiving its certificate, $1,000 in monthly payments and shall make further deposits of $1 for each $1,000 of protection until a total of $10,000 shall have been so deposited. The deposits so made are subject to a lien for any unsettled final judgment of a court of Arizona (Section 53-605 (d)) and any interest earned on the deposit or other corporate assets may be used for general operating expenses (Section 53-605 (c) and 53-609 (b)). It is obvious that the petitioner's so-called "reserve" held by the state treasurer of Arizona is not that contemplated by the statute since it may be invaded and completely wiped out at any time for purposes other than fulfilling *97 its contractual obligations referred to in section 201 (a), I.R.C.First National Benefit Society v. Stuart, 134 Fed. (2d) 438. In Helvering v. Inter-Mountain Life Ins. Company, 294 U.S. 686, the Court said: "The word 'reserve' has many meanings. Accounts creating reserves are set up in almost every line of business and funds evidenced by the book entries are held for many and widely different purposes. As the act does not permit corporations other than insurance companies to make deductions of the kind here under consideration, 'reserve funds' may not reasonably be deemed to include values that do not directly pertain to insurance. In life insurance the reserve means the amount, accumulated by the company out of premium payments, which is attributable to and represents the value of the life insurance elements of the policy contracts." In that the petitioner's reserve bore no relationship to life insurance values it has also failed to conform its reserve to the concept of an insurance reserve as contemplated by the statute. Therefore, we sustain the respondent's determination that the petitioner, during the taxable year 1939, was not a life insurance company as defined in section 201. *98 The respondent has taxed the petitioner as a mutual insurance company, other than life, pursuant to the provisions of section 207. Under section 207 (c)[3] *99 such a company is entitled to certain deductions. The petitioner claims that the sum of $4,518.71 deposited with the State Treasurer of Arizona during the taxable year was deductible as a net addition required by law to be made to its reserve funds. The respondent contends that such deposits were not those "required by law." What we have said concerning the nature of the petitioner's so-called "reserve" funds in our discussion of the primary issue is equally applicable to this collateral issue. Section 19.207-4 of Regulations 103 defines "reserve funds required by law" as follows: "* * * Reserve funds 'required by law' include not only reserves required by express statutory provisions but also reserves required by the rules and regulations of State insurance departments when promulgated in the exercise of an appropriate power conferred by statute, but do not include assets required to be held for the ordinary running expenses of the business, such as taxes, salaries, reinsurance, and unpaid brokerage. Only reserves commonly recognized as reserve funds in insurance accounting are to be taken into consideration in computing the net addition to reserve funds required by law." In Commissioner v. National Reserve Insurance Co., supra, the Court held that funds so deposited with the Arizona treasurer do not comply with the requirements of Section 19.203 (a) (2)-1. In other words, it is not a real reserve fund. Since the "net addition" required by the Arizona statute was not made *100 to a "reserve" fund, the deduction is not allowable. The petitioner argues further that it was an assessment company during the taxable year and thus comes within the parenthetical inclusion of section 207 (c) (1) (A). Assuming that the petitioner maintained such a reserve fund - and we have held otherwise - it has not proven that it was an assessment company. During 1939 it had in force only 34 out of 10,900 outstanding "policies" (or a.32+ per cent), labeled "Assessment Forms", the remaining being clearly not subject to assessment as shown by the facts that the payments are called premiums, the contracts are called certificates or policies and their holders are denominated members or policy holders. Such "assessment forms" were not presented in evidence. We cannot determine their true character from their name alone. Consequently, the petitioner has failed to show that it was an assessment company and functioned as such during the taxable year. We, therefore, reject this contention. In the second subordinate issue the petitioner claims the right to deduct $3,675.41 representing the accrued portion of the compensation of its general manager (who is also its president) unpaid in 1939. *101 It argues that since the respondent accrued the petitioner's unpaid claims, which were reported at the close of the year and upon which no proof of claim had been made, he should have accrued also the unpaid portion of its president's compensation or "salary". The petitioner made its return on the cash basis. The respondent accepted that basis and so computed all other items thereon with the single exception of the unpaid claims. He deemed that such treatment was necessary correctly to reflect the petitioner's true income and the petitioner has not challenged the propriety of his action. Reese's salary or compensation is in the same category as other expense items and should be treated similarly - on the cash basis. The petitioner has failed to present any evidence proving his claim to certain other deductions under section 207 (c) (3) and, therefore, is considered to have abandoned the issue relating to them. Decision will be entered for the respondent. Footnotes
1. Sec. 19.203 (a) (2)-1. Reserve Funds. - In general, the reserve contemplated is a sum of money, variously computed or estimated, which, with accretions from interest, is set aside (reserved) as a fund with which to mature or liquidate, either by payment or reinsurance with other companies, future unaccrued and contingent claims. ↩
2. The term "reserve" or "reserves" has a special meaning in the law of insurance. While its scope varies under different laws, in general it means a sum of money, variously computed or estimated, which, with accretions from interest, is set aside - "reserved" - as a fund with which to mature or liquidate, either by payment or reinsurance with other companies, future unaccrued and contingent claims, and claims accrued, but contingent and indefinite as to amount or time of payment.
3. SEC. 207. MUTUAL INSURANCE COMPANIES OTHER THAN LIFE. (c) Deductions. - In addition to the deductions allowed to corporations by section 23 the following deductions to insurance companies shall also be allowed, unless otherwise allowed - (1) Mutual Insurance Companies Other Than Life Insurance. - In the case of mutual insurance companies other than life insurance companies - (A) the net addition required by law to be made within the taxable year to reserve funds (including in the case of assessment insurance companies the actual deposit of sums with State or Territorial officers pursuant to law as additions to guarantee or reserve funds); and (B) the sums other than dividends paid within the taxable year on policy and annuity contracts.↩